IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:21-cv-02038-CNS-KLM

ARGELIA ENRIQUE-CHAVEZ, individually and as a representative on behalf of the Estate of Gerardo Manuel Chavez, deceased,

    Plaintiff,

v.

DILLON COMPANIES, LLC, doing business as The Kroger Company,

    Defendant.

---

# ORDER

---

This case concerns whether Dillon Companies, LLC ("Dillon" or "Defendant") is liable in tort following a worker's injury (later resulting death) sustained while working as a contracted security guard at one of Dillon's facilities. Before the Court is Defendant's Rule 56 Motion for Summary Judgment (ECF No. 49). The Court DENIES Defendant's motion for the reasons stated herein.

## I. FACTS

A. Security Duties at Denver Central Fill

Dillon, also known as and doing business as the Kroger Company, owned Denver Central Fill, a facility where pharmaceutical prescriptions are filled and sent to Kroger's individual pharmacy stores. (ECF Nos. 49, p. 3; 91-2, p. 4). The facility is "non-customer facing." (ECF No. 91-3, p. 2). Kroger employees provide (or have provided in the past) some level of security

1

services at some number of Kroger stores and facilities nationwide, including at Denver Central Fill. (ECF 49-1, pp. 1–2). In addition, Dillon contracts with third-party companies to provide some form of security services at some number of its stores and facilities nationwide, including Denver Central Fill. (*Id.* at p. 1). American Guard Services (AGS) is a company Kroger contracted with to provide security at Denver Central Fill and other Kroger stores nationwide. (ECF No. 50, p. 1).

The details of the "security" duties assigned to both Kroger employees and AGS contractors is in dispute. First, it is unclear what specific duties the third-party security contractors had while patrolling Denver Central Fill. According to Kevin McClanahan, the Denver Assistant Division Asset Protection Manager for King Soopers, "King Soopers outsourced its security needs at Denver Central Fill to various third-party security companies." (ECF No. 49-1, p. 2). While he did not specify the duties of the contracted security guards, Mohamed Youssef, General Counsel for AGS, stated that "AGS security officers assigned to Denver Central Fill were provided with Post Orders outlining their roles and responsibilities at Denver Central Fill." (ECF No. 50, p. 2). The Post Orders are a comprehensive list of job duties for security guards, but by their terms, they are not applicable to Denver Central Fill. The orders describe how security staff should interact with "customers," "monitor for excessive carts in the parking lot," avoid "sacking groceries," and engage in other duties applicable to customer-facing shopping centers rather than internal-facing pharmacy warehouses like Denver Central Fill. (ECF No. 50, pp. 16–20). These security orders omit mention of monitoring shipments and deliveries of pharmaceuticals.

Moreover, it is unclear what precise security duties Kroger employees performed while working at Denver Central Fill. According to Kevin McClanahan, "Denver Central Fill utilized loss prevention associates employed by King Soopers to provide security services at" the facility,

but he did not describe the duties of these loss prevention associates, other than generally stating "[t]he 'Uniformed Security Officer Post Orders' . . . are the same Post Orders applicable to loss prevention associates providing security services . . . at various Kroger locations nationwide." (*Id.*). He did not clarify that these Post Orders were applicable at Denver Central Fill, and as already discussed, these orders appear to be largely inapplicable to Denver Central Fill. (ECF No. 50, pp. 16–20). Separately, Jeff Scott, Kroger's Manager of Central Pharmacy, stated in a deposition that guards watched over employees while they took breaks or walked to their cars, and monitored the exterior of the facility. (ECF No. 91-2, pp. 5–7). He stated that the guards typically "park in a location across the street where they can see the whole facility and usually stay in their car for the most part," (*id.* at p. 6) which is in direct conflict with the Post Orders specifying that "[s]itting in a parked vehicle while on duty protecting an OPEN store is prohibited" (ECF No. 50, p. 19).

It is also disputed why security services were necessary at Denver Central Fill. Kevin McClanahan declared that security was needed because of the "high volume of pharmaceutical products delivered to and kept at the center." (ECF No. 49-1, p. 2). While he did not elaborate, the natural inference is that the facility needed security guards to observe incoming and outgoing shipments of pharmaceuticals to prevent theft of product. However, Plaintiff submitted video surveillance of Denver Central Fill's loading docks, depicting several hours of the day when deliveries and shipments are loaded onto trucks without a security guard present. (*See* ECF No. 91, p. 12). Plaintiff also submitted evidence that the AGS security guard stationed at Denver Central Fill worked forty hours over a five-day week from around 2:30 PM until 11:30 PM; yet, many pharmaceutical deliveries occur outside of these hours. (*See* ECF Nos. 91-2, p. 7; 91-3, p. 4; 91-6, p. 3). Moreover, according to Jeff Scott, "the primary reason we have a security guard at

3

Denver Central Fill was . . . [to] watch over the employees on breaks on second shift," help staff "feel safe walking to their car at night," and "to monitor . . . the exterior of the facility." (ECF No. 91-2, pp. 5–7). He stated that, while the "expectation[] is [that] they monitor the facility," especially while shipments were loaded or unloaded, they were rarely "in the loading dock area while activity [was] occurring" because they parked across the street to observe. (*Id.* at p. 6).

Finally, it is unclear what date ranges Kroger employees or other third-party companies (including AGS) provided security services at Denver Central Fill.[1] Kevin McClanahan stated that King Soopers outsourced its security needs at Denver Central Fill beginning in August 2016. (ECF No. 49-1, p. 2). However, Mohamed Youssef seemed to indicate that AGS was hired in March 2014 to provide services at Denver Central Fill, stating that "AGS security officers assigned to Denver Central Fill were provided with Post Orders outlining their role and responsibilities at Denver Central Fill. The Post Orders [were] provided to AGS security officers between March 18, 2014 and August 10, 2020 . . . ." (ECF No. 50, p. 2). Jeff Scott also recalled that security guards arrived at Denver Central Fill around approximately 2014. (ECF No. 91-2, p. 7).

B. The Accident and Subsequent Litigation

Gerardo Manuel Chavez worked as a security guard for AGS and was stationed at Denver Central Fill. On August 10, 2020, during his security shift, he leaned against an unsecured railing next to a loading dock and fell backwards onto concrete, sustaining internal injuries which led to his death several days later. (ECF No. 83). Mr. Chavez's surviving family members received a workers' compensation payment from AGS for the incident. (ECF No. 49, p. 5).

---

[1] Neither Defendant nor Plaintiff provided any contract documents specifying the dates of Denver Central Fill's security coverage.

4

Argelia Enrique-Chavez, individually and as a representative on behalf of the estate of Mr. Chavez ("Plaintiff"), then filed a civil action in Colorado state court on July 1, 2021, which was removed to the U.S. District Court of Colorado on July 28, 2021. (ECF Nos. 1, 1-1). Plaintiff filed an original complaint on July 28, 2021 and an amended complaint on October 13, 2022. (ECF Nos. 6, 83). In the amended complaint—the operative complaint—Plaintiff raises a wrongful death claim and a survival action, both based in the theory of premises liability. (ECF No. 83, pp. 7–9).

Defendant filed a motion for summary judgment arguing that Plaintiff cannot recover on either of her claims because Dillon was a statutory employer of Mr. Chavez. (ECF No. 49). If this is true, the Colorado Workers' Compensation Act entitles Dillon to immunity from liability beyond the payment of workers' compensation benefits, which Plaintiff already received. (*Id.*). In response, Plaintiff argues that Dillon was not a statutory employer, or at least that genuine disputes of material fact exist surrounding Dillon's employer status. (ECF No. 91). With the filing of Defendant's reply (ECF No. 92), the motion is now fully briefed and ripe for adjudication.

## II.  LEGAL STANDARD

Summary judgment "is a drastic action and available only in cases where . . . a formal trial would be fruitless." *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir. 1966). Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears the initial burden, but once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256 (1986).

Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

### III. ANALYSIS

The relevant portions of Colorado's Workers' Compensation Act state the following:

> (1)(a)(I) Any person, company, or corporation operating or engaged in or conducting any business by *leasing or contracting out any part or all of the work* thereof to any lessee, sublessee, contractor, or subcontractor . . . shall be construed to be an employer . . . and shall be liable as provided in said articles to pay compensation for injury or death resulting therefrom to said lessees, sublessees, contractors, and subcontractors and their employees or employees' dependents, except as otherwise provided in subsection (3) of this section. . . .
>
> (2) If said lessee, sublessee, contractor, or subcontractor is also an employer in the doing of such work and, before commencing such work, insures and keeps insured its liability for compensation as provided in articles 40 to 47 of this title, *neither said lessee, sublessee, contractor, or subcontractor, its employees, or its insurer shall have any right of contribution or action of any kind*, including actions under section 8-41-203, *against the person, company,* or corporation operating or engaged in or conducting any business by *leasing or contracting out any part or all of the work thereof*, or against its employees, servants, or agents.

Colo. Rev. Stat. § 8-41-401 (emphasis added). The purposes behind these statutory sections are two-fold. Section (1)(a)(I) "prevent[s] employers from avoiding" their duty to pay workers' compensation payments to injured workers "by contracting out their regular work to uninsured independent contractors." *Phathong v. Tesco Corp. (U.S.)*, 557 F. App'x 821, 825 (10th Cir. 2014). Parallel to this liability is a resulting benefit for employers: Section (2) "confer[s] immunity from other legal actions in return for the liability imposed" by section 1(a)(I). *Buzard v. Super Walls, Inc.*, 681 P.2d 520, 522 (Colo. 1984).

In Colorado, courts apply the "regular business test" to determine if an entity is a statutory employer under the Colorado Workers' Compensation Act. *Finlay v. Storage Tech. Corp.*, 764 P.2d 62, 64 (Colo. 1988). The Tenth Circuit aptly summarized this test:

> Whether a corporation . . . is a statutory employer under the terms of § 8-41-401 is dependent upon the nature of the "work contracted out." Colorado employs the "regular business test" to determine whether the party contracting out work is a statutory employee; the test is satisfied "where the disputed services are such a regular part of the statutory employer's business that absent the contractor's services, they would of necessity be provided by the employer's own employees." The Colorado Supreme Court has described its "regular business test" as intentionally broad and has justified an inclusive test as necessary "to accommodate more fully the purposes of the workers' compensation act." In applying the regular business test, courts should consider "the constructive employer's total business operation, including the elements of routineness, regularity, and the importance of the contracted service to the regular business of the employer." The importance of the contracted service to the employer's total business operation is demonstrated where, absent the contractor's services, the employer would have to provide its own employees rather than forgo having the work performed. In other words, where the work is so essential to the day-to-day business operations of the employer that it cannot continue to function without the task being performed, its importance to the total business operation is demonstrated.

*Phathong*, 557 F. App'x at 826–27 (citing *Finlay*, 764 P.2d at 64, 66, 67).

Courts applying the regular business test primarily examine whether the supposed employer would, absent a hired contractor, train its own employees to do the contracted work. They less often resort to applying the three-factor test examining the routineness, regularity, and importance of the contracted work. Moreover, courts often examine the precise contracted duties in determining whether a company qualifies as a statutory employer.

For example, in *Finlay*, when determining whether a computer hardware manufacturing company was a statutory employer, the Colorado Supreme Court scrutinized the needs of the company in determining whether contracted janitorial services were an integral part of its business. 764 P.2d at 67–68, n. 5. Ultimately, the court determined that the manufacturer required an

"unusually clean environment," deeming it a statutory employer of a contracted janitor. *Id.* at 68. Janitorial services were "of such importance" that the manufacturer would have obtained them "by other means including, if need be, the training and utilization of its own employees to accomplish the cleaning tasks." *Id.*   Similarly, in *Black v. Cabot Petroleum Corp.*, the Tenth Circuit determined whether an oil drilling company was a statutory employer of a contracted worker hired to plug and cap an old well.  877 F.2d 822, 823 (10th Cir. 1989).  The court noted that state regulations "specifically required [the drilling company] to plug and cap oil wells before abandoning them," so it "had no choice" but to train its own employees if it did not have a contractor doing the work. *Id.* at 825.  The company was therefore a statutory employer immune from tort liability. *Id.*  Finally, in *Humphrey v. Whole Foods Market*, the Colorado Court of Appeals analyzed whether a grocery store was the statutory employer of a contracted worker who stocked burritos in the store.  250 P.3d 706, 708 (Colo. App. 2010).  The court noted that "it was part of the store's normal business to display food products and to remove expired products from the shelves," that the injured worker "performed these very tasks when he delivered burritos to Whole Foods' store," and that "Whole Foods employees would have had to perform" these tasks absent the contractor. *Id.* at 710.  As a result, Whole Foods was considered a statutory employer of the contracted worker. *Id.* at 711.

In narrow circumstances, courts need not apply the "regular business test" if the work contracted out by a company out is clearly within the scope of the company's business.  Thus, "the regular business test is superfluous when the scope of an entity's contracted business and work is clear (*if it is equally clear that a particular activity falls within that scope*)." *Monell v. Cherokee River, Inc.*, 347 P.3d 1179, 1182–83 (Colo. App. 2015) (emphasis added).  In *Monell*, a company that built buildings subcontracted with a third party to help it build such a building. *Id.* at 1181.

8

This subcontracted work was clearly within the scope of the company's business, so the court held (without applying the regular business test) that the company was the statutory employer of an injured contracted worker. *Id.* at 1183.  However, if the contracted work does not clearly fall within the scope of the company's business, courts should apply the regular business test when determining if a company is a statutory employer. *Id.*

With these rules in mind, there is a genuine dispute of material fact regarding whether Dillon was Mr. Chavez's statutory employer.

Dillon first argues that, in line with *Monell*, applying the regular business test is not necessary in this case because "Dillon literally contracted out part of its business at [Denver Central Fill] to AGS," making it a statutory employer. (ECF No. 92, p. 5).  However, unlike in *Monell*—where a building-construction company contracted out the construction of a building, which was clearly part of the company's business—it is not clear that security services were part of Dillon's business operations at Denver Central Fill.[2]  Therefore, since the scope of Dillon's "work" is somewhat unclear in relation to AGS's security services, it is necessary to apply the regular business test.

In its attempt to show the regular business test favors Dillon, Defendant argues that "Kroger and its subsidiaries regularly use employees and third-party security services at its various locations, and Dillon actually used its own employees as security guards at this specific [Denver Central Fill] location before outsourcing to third party vendors beginning in 2016." (ECF No. 92, p. 7).  Thus, because it had its own staff work security duties in the past at Denver Central Fill,

---

[2] The Court must focus on the importance of security at Denver Central Post specifically, rather than the role security plays to Kroger as an entire organization. *Cf. Melody Homes, Inc. v. Lay*, 610 P.2d 1081, 1082 (Colo. App. 1980) (finding it necessary to analyze the business practices of the specific workplace in question, rather than the "employment practices of similar businesses").

9

Dillon argues that such duties were "of necessity" and therefore sufficient to satisfy the regular business test. *Phathong*, 557 F. App'x at 826.

However, Dillon provides thin, and somewhat contradictory, evidence in supporting its claim that its employees conducted security duties that were later contracted to third party security companies.[3] First, it is unclear what "security" duties Kroger employees originally performed; Dillon submitted a declaration from Kevin McClanahan that employees at Denver Central Fill completed the same duties as outlined in the AGS Post Orders (ECF No. 49-1, p. 2), but that cannot be true because the Post Orders are largely inapplicable to a non-customer-facing warehouse like Denver Central Fill, (ECF No. 50, pp. 16–20 (Post Orders containing instructions to interact with "customers," "monitor for excessive carts in the parking lot," avoid "sacking groceries," and engage in other duties relevant to customer-facing shopping centers)). By the same logic, it is also unclear what precise security duties AGS or other contractors completed at Denver Central Fill; Mohamed Youssef stated that the Post Orders described the contractors' security duties at Denver Central Fill, which, again, cannot be the case. (ECF No. 50, p. 2).

The contradictory evidence about "security" responsibilities at Denver Central Fill[4] falls short of that needed to support Defendant's argument that the contractor was filling a specific need. Indeed, in *Humphrey*, the discrete tasks of the contracted worker were clear: he "inventoried the burritos, determined the new supply needed, selected the products to put in stock, removed the

---

[3] Overall, in support of its argument that Dillon was a statutory employer, Defendant only submitted two sworn declarations spanning three pages each (ECF Nos. 49-1, 50) and a contract between Dillon and AGS to provide security services at Kroger stores in various states, which by its very terms did not apply to Denver Central Fill (ECF No. 50).

[4] While it seems clear what the security duties were at Dillon's customer-facing stores (as described in the AGS Post Orders), the Court focuses on the security duties at Denver Central Post specifically. *Cf. Melody Homes*, 610 P.2d at 1082 (finding it necessary to analyze the business practices of the specific workplace in question, rather than the "employment practices of similar businesses").

outdated items, and arranged the new items on the display shelves for sale." 205 P.3d at 710. The court analyzed these specific duties—rather than relying on a generic description of the work—to determine that such services "would of necessity [have been] provided by the employer's own employees." *Id.* (alteration in original). Also contrast *Black*, where the court noted in detail that contracting out the job of "plug[ging] and cap[ping]" oil wells involved the specific duties of "cutting off the well head and welding a steel plate over the well's opening." 877 F.2d at 823. Here, Defendant has simply produced evidence that, generically, "security" duties existed at Denver Central Fill, and there are too many unknowns about what those duties specifically entailed for both Kroger employees and AGS security guards. Thus, there is a genuine dispute about whether Defendant delegated the same security duties from Kroger employees to contracted AGS guards.

Defendant could theoretically still satisfy the regular business test by showing that AGS's work was regular, routine, and important. *See Phathong*, 557 F. App'x at 826–27. It is undisputed that AGS provided security services forty hours per week during a five-day workweek. (ECF No. 91-6, p. 3). Even if the Court assumes, for the purposes of this Order, that such security coverage suffices as regular and routine, there are genuine disputes about why security duties were "important" at Denver Central Fill.[5]

Kevin McClanahan's declaration indicates that security was necessary to monitor the incoming and outgoing shipments of pharmaceuticals (ECF No. 49-1, p. 2), but other evidence

---

[5] Dillon cites *Melody Homes*, 610 P.2d 1081 (Colo. App. 1980), for the blanket proposition that "security services are considered part of a company's regular business" (ECF No. 92 at 7). But security services were important in that case because of the specific needs of the employer in that case (a construction company)—it cannot be generalized that all security services are an integral part of any business. Thus, the Court must analyze whether security was important specifically at Denver Central Fill.

11

undermines this claim. According to video surveillance of Denver Central Fill (*see, e.g.*, ECF No. 91-4, 12:00 PM MST) and deposition testimony of various Kroger employees (ECF Nos. 91-2, p. 7; 91-3, p. 4), a security guard is not present during many hours in which pharmaceutical shipments occur. And Jeff Scott provided a different rationale: security was necessary to ensure the safety of employees who took breaks or walked to/from their cars. (ECF No. 91-2, pp. 5–7). Contrast *Finlay*, where the court enumerated several certain attributes of a computer hardware manufacturer in determining that janitorial services were a necessary part of the manufacturer's business. 764 P.2d at 68 n.5 (Colo. 1988) ("[The] business required it to maintain an unusually clean environment . . . [that had] the following features: (1) structural members were sealed with acrylic to eliminate concrete dust, (2) vinyl asbestos floors were installed in manufacturing areas, (3) dock areas were screened from manufacturing areas, (4) positive air pressure was maintained, (5) air intake systems had higher than normal filtration levels, (6) windows did not open. These precautions were necessary to prevent airborne dirt and dust from damaging the delicate magnetic and electric components of Storage Technology's computer equipment."). Without a similarly precise understanding of Denver Central Fill's needs, the Court here cannot ascertain whether security was "important."

      Moreover, it is also unclear if there was uninterrupted security coverage at Denver Central Fill. While Kevin McClanahan stated that security was outsourced in 2016 (with the implication that Kroger employees worked security duties until that date) (ECF No. 49-1, p. 2), Mohamed Youssef stated that AGS was hired in 2014 to provide security at Denver Central Fill (ECF No. 50, p. 2). Defendant's own evidence, then, misaligns the start- and end-dates for contracted security services, which leaves open the possibility that security services were absent during some period. If that were true, it would undercut the notion that security services were "important" to

the overall business at Denver Central Fill. In sum, the three-factor test is inconclusive in establishing whether Dillon was Mr. Chavez's statutory employer, and this must be determined by the factfinder.

Finally, in its attempt to appeal to the spirit of the Colorado Workers' Compensation Act, Defendant argues that "[f]inding that Dillon is a statutory employer is consistent with the Act's purpose," since courts should construe the legislation "broadly to effectuate the Act's purpose of ensuring employers a remedy for work-related injuries without consideration of fault." (ECF No. 92, p. 3). The Court acknowledges the Act's broad purpose, but the available evidence is still too contradictory to establish that Dillon was a statutory employer entitled to tort immunity as a matter of law.

Overall, Dillon has failed to show there is no genuine dispute as to any material fact about whether it is a statutory employer. Thus, the Court denies Defendant's motion for summary judgment.

## IV. CONCLUSION

For the reasons contained herein, Defendant's Motion for Summary Judgment is DENIED. (ECF No. 49).

DATED this 28th day of February 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

13